**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **William Fredrick Williams,** | ) **Case No. 16-30243-can13** |
| **Debtor.** | ) |
| _____ | ) |

### MEMORANDUM OPINION AND ORDER SUSTAINING THE UNITED STATES' OBJECTION TO CONFIRMATION AND DENYING WITHOUT PREJUDICE THE UNITED STATES' MOTION FOR DECLARATORY JUDGMENTS

In the context of a long-running dispute between a pro se debtor and the United States of America, the United States objects to confirmation of a Chapter 13 plan that reneges on a settlement reached in a previous Chapter 13 case – a settlement that would have allowed the United States to enforce its restitution judgment against a debtor's IRA once the previous case completed. The United States also asks this court for a declaratory judgment that the stay does not apply to its broader restitution enforcement efforts against the debtor. Under the facts of this case, this court agrees that the plan reneging on the settlement has not been proposed in good faith and that the United States should be allowed to liquidate the IRA, but declines to issue a declaratory judgment that would extend beyond the scope of the current controversy.

### *Procedural Background*

The facts and procedural history of this case span one criminal case and two Chapter 13 bankruptcy cases. Although the procedural history is lengthy, it is nonetheless necessary to understanding the current controversy between the two parties, especially because the parties waived their right to an evidentiary hearing and agreed to submit the matter on the moving papers and briefs.

1

*The Criminal Case*

The procedural history of this case starts on June 27, 2006, almost eleven years ago. On that date, William F. Williams, the debtor here, was indicted in the Western District of Missouri for violations of 18 U.S.C. §§ 1957 and 2314.[1] He pled guilty to Count II of the indictment. The District Court sentenced Mr. Williams to 21 months of imprisonment and three years of supervised release. In addition, the District Court ordered Mr. Williams to pay a $100 assessment and restitution of $196,361.49. The District Court waived interest on the restitution, which was due immediately, although the order stated Mr. Williams was to make payments of $100 per month. The restitution payee was Hendren Chevrolet-Pontiac.[2]

In November 2012, after the completion of Mr. Williams' prison sentence and supervised release, the United States filed an Application for Writ of Garnishment in the District Court, pursuant to 28 U.S.C. § 3205 of the Federal Debt Collection Procedure Act. The Application stated Mr. Williams had been making $100 monthly payments, and that $189,511.49 remained outstanding. The proposed garnishee was National Financial Services, LLC ("NFS"). NFS answered that it held $103,571 in an individual retirement account ("IRA") belonging to Mr. Williams. Mr. Williams first attacked the garnishment on the grounds that Missouri law allowed him to exempt the IRA. Mr. Williams' son, Chad Williams, also sought to intervene, asserting that his father had given him a lien in the IRA before the United States' restitution judgment was entered. The District Court ruled against Mr. Williams and his son on both issues. In an order dated March 14, 2013 (the "Turnover Order"),  the District Court ordered that NFS turn over the IRA to the Clerk of Court for the Western District of Missouri in partial satisfaction of the restitution.

---

[1]   *USA v. Williams*, Case No. 3:06-cr-05032, the Honorable Fernando Gaitan presiding.
[2]   The restitution payee has not participated in this bankruptcy case or the prior one.

2

*First Chapter 13 Filing*[3]

On March 18, 2013, four days after the District Court Turnover Order, Mr. Williams filed a pro se Chapter 13 bankruptcy with this court.[4] He scheduled the IRA as a 401k worth $104,000.[5] Mr. Williams originally scheduled the United States as having a $104,000 secured claim. He then filed an amended Schedule E, listing the United States' claim as a priority, unsecured claim for $94,305.75. Mr. Williams first formally informed the District Court of his bankruptcy filing about a week after the filing.[6]

In April 2013, Mr. Williams sent a letter to this court construed as a motion for stay violation damages under 11 U.S.C. § 362(k)[7] ("Stay Violation Motion"). In the Stay Violation Motion, Mr. Williams alleged that despite the United States' having notice of the bankruptcy, the United States intended to pursue turnover of the IRA. Mr. Williams also alleged that NFS sent the IRA funds to the District Court on April 5, after the United States had notice of the bankruptcy. Mr. Williams then sent a second, similar letter to this court, asking for return of the IRA funds. This court set the Stay Violation Motion for hearing.

In lieu of filing a response to the Stay Violation Motion, the United States filed a motion to continue the hearing, arguing in essence that the District Court should decide whether the

---

[3]     Besides the long-running dispute between the United States and Mr. Williams, there have also been numerous disputes between Mr. Williams and the Chapter 13 Trustee, including motions to deny confirmation and objections to exemptions, and disputes between Mr. Williams and the holder of a deed of trust on his house. Currently, however, these disputes are secondary to the dispute between Mr. Williams and the United States. Thus, this court leaves out the majority of the procedural history not involving the United States.

[4]     Case No. 13-30181-can13.

[5]     It was later determined that the 401K scheduled by Mr. Williams is the same IRA that was the subject of the Turnover Order.

[6]     Mr. Williams filed a notice of bankruptcy with the District Court. The District Court treated this filing as a motion to stay the garnishment. The United States responded that the stay did not apply under the stay exception in 11 U.S.C. § 362(b)(1). Mr. Williams filed a reply, arguing that he only owed half of what the United States said he owed, and also asked for time to seek resolution of a claim against the restitution payee. The District Court ultimately denied the motion as moot, leaving this court to hear and determine the stay-related issues.

[7]     All further statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* unless otherwise noted.

automatic stay applied to the United States' collection efforts. In a written order, this court denied the United States' motion and directed it to file a response. The United States' substantive response asked for a determination that the stay does not apply, or, alternatively, for relief from the automatic stay if the stay did apply ("Motion for Relief from Stay").

At a May 2013 status conference on both motions, the United States stated it needed discovery, and Mr. Williams requested time to hire an attorney. The court agreed to give both parties additional time, and continued both motions to a June status conference with a final evidentiary hearing set for August 2013.

In the meantime, Mr. Williams had filed a plan, albeit untimely, that proposed to pay creditors $100 per month for 36 months. The plan did not address the United States' secured restitution claim or disposition of the IRA. After Mr. Williams attempted to amend the plan to propose a surrender of his home, the United States objected to confirmation on the grounds the plan failed to treat its secured claim and was proposed in bad faith, among other arguments. A day later, the United States also filed a motion to dismiss the Stay Violation Motion or, alternatively, for declaratory judgment or summary judgment ("Motion for Partial Summary Judgment"). In its Motion for Partial Summary Judgment, the United States argued that its restitution enforcement actions were excepted from the stay as the continuation of a criminal proceeding under § 362(b)(1), or in the alternative that the Mandatory Victims Restitution Act ("MVRA")[8] supersedes the automatic stay in bankruptcy.

Meanwhile, Mr. Williams asked for and received a continuance of the August 2013 hearing on the Stay Violation Motion and Motion for Relief from Stay (over the United States' objection) due to his continuing efforts to find an attorney. The court thus rescheduled the

---

[8]    *See* 18 U.S.C. § 3663A; *see also* 18 U.S.C. § 3613.

evidentiary hearing on both stay-related motions to October 2013. In the interim, the court held a preliminary hearing on the United States' First Objection to Confirmation in July 2013. At that hearing, the parties agreed that the First Objection to Confirmation required evidence and should be heard with the dueling stay-related motions already set for a final evidentiary hearing in October 2013, since all three matters were intertwined. At the same time, the court informed Mr. Williams that he had failed to respond timely to the United States' Motion for Partial Summary Judgment. Mr. Williams orally moved for another 21-day extension, which the court granted. Mr. Williams did not, however, timely respond to the United States' Motion for Partial Summary Judgment, instead moving for another 60 days, arguing that he had never seen the United States' Motion before the hearing.

Noting that a 60-day extension would give Mr. Williams until just before the evidentiary hearing set in October, the court entered an order granting Mr. Williams a partial extension of 14 days and setting another hearing in August 2013 to give Mr. Williams a chance to explain his need for an additional sixty days to respond. Before the extended deadline, however, Mr. Williams filed a "Motion for Violation of Automatic Stay and Creditor Misconduct," which this court treated as a response to the United States' Motion for Partial Summary Judgment.[9] The court thus denied the 60-day extension request as moot, considering the three pending matters (Mr. Williams' Stay Violation Motion, and the United States' Motion for Relief from Stay and First Objection to Confirmation) fully responded to and ready to be heard in October.

---

[9] This motion for the first time named NFS as a party to the Stay Violation Motion. NFS responded to the motion, then participated in the trial on November 14, 2013. NFS moved for a judgment on the Stay Violation Motion at the close of Mr. Williams' case-in-chief. This court granted the motion, and later entered an order finding in NFS' favor and dismissing Mr. Williams' claim against NFS under FED. R. CIV. P. 41(b), as incorporated by FED. R. BANKR. P. 9014.

At the final pretrial conference before the October 2013 evidentiary hearing, the United States informed the court of the possibility that its witnesses would not be able to attend the October 17 hearing due to the impending federal government shut-down. The court sua sponte continued the evidentiary hearing to November 14, 2013, and entered an order denying the United States' Motion for Partial Summary Judgment.

Ten days before the November 2013 final evidentiary hearing, Mr. Williams filed a motion requesting that the court order "the Department of Justice to return the $108,022.10" to him. The United States responded that the Department of Justice did not control the funds but that the District Court did. Given the proximity of that motion to the hearing, it was not heard with the other matters in November.

The court thus took up Mr. Williams' Stay Violation Motion, the United States' Motion for Relief from Stay, and the United States' First Objection to Confirmation at an evidentiary hearing in November 2013, and denied the United States' motion for a judgment at the conclusion of Mr. William's case-in-chief. During closing arguments, however, the United States and Mr. Williams agreed to mediate their dispute. The court thus deferred ruling, and appointed the Honorable Arthur B. Federman as mediator. Mediations were set for January 8, 2014 and February 5, 2014, but were postponed for unknown reasons. On June 11, 2014, Judge Federman conducted a first round of mediation, but Mr. Williams and the United States were unable to reach a settlement.

At a status conference in early July 2014, after the earlier failed mediation attempts, Mr. Williams and the United States represented that with Judge Federman's continuing assistance, they were nearing a settlement. The court thus continued the status conference to late July 2014. Before the status conference, however, Mr. Williams filed a motion asking the court to find that

Chad Williams had a lien in the IRA that was superior to the United States' lien. At the July 29 status conference, this court shared its belief that Judge Gaitan had already ruled the Chad Williams issue, but agreed to hold the motion in abeyance. Based on the parties' representations that they were still close to a settlement, this court continued the matter to an August 2014 date. Mr. Williams then filed another motion before the August 2014 status conference, again asking for return of the IRA funds. The court denied the new motion.

At the continued status conference in August 2014, the United States represented that the parties were still working on a settlement, but informed Mr. Williams that it made its last and best offer. Based on this representation, the court continued the matters yet again to another status conference in September 2014, but warned the parties that this was the last continuance. Prior to the September 2014 hearing, the United States filed a statement informing the court that a settlement was unlikely. At the hearing, however, the parties announced they had reached a settlement. The United States expressed concern that Mr. Williams felt he was being bullied into settlement. Mr. Williams reiterated that he wanted to settle and would sign the settlement agreement.

After Mr. Williams signed the settlement agreement, the United States filed a Rule 9019 Motion to approve the settlement in late September 2014. In response, Mr. Williams sent a letter to this court complaining of the one-sidedness of the negotiations. To ensure that the settlement was voluntary, the court set the Rule 9019 Motion for hearing, even though no party, including Mr. Williams, had objected. At the hearing, Mr. Williams again expressed reservations about the settlement, but said he wanted to settle with the United States on the terms reached during the mediation. The United States reiterated that it would still allow Mr. Williams to back out of the settlement if he so desired, but Mr. Williams restated his intent to abide by the settlement terms.

Under the settlement agreement, the parties agreed that an order would be filed with the District Court, directing the Clerk of the District Court to return the entirety of the IRA funds to NFS.[10] The order also directed NFS not to treat the turnover as a distribution to Mr. Williams for tax purposes. The parties agreed that NFS could reinvest the funds in an IRA in a manner acceptable to both parties, and that Mr. Williams would not be able to withdraw any funds from the IRA during the pendency of the Chapter 13 bankruptcy.

In exchange for receiving a return of the IRA funds and retaining limited powers to manage the investment, Mr. Williams agreed to dismiss the Stay Violation Motion with prejudice and to propose a plan paying $100 a month to the United States during the bankruptcy case. The intent of the parties was to spare Mr. Williams the immediate tax consequences of liquidating the IRA and to allow him to manage and hopefully increase the value of the IRA during the life of the plan. This way, at the end of the plan when he turned the IRA over, Mr. Williams would have had several years to increase its value and plan for the tax consequence when the United States finally enforced its restitution lien.

After hearing from the parties about the terms of this settlement, reached over months of negotiation and with the supervision of Judge Federman as mediator, the court concluded that the settlement was fair and equitable, especially in light of the complexity of the issues presented and the beneficial tax treatment for Mr. Williams. This court noted it probably would have found for Mr. Williams on the merits of the Stay Violation Motion but awarded (at most) nominal damages and granted the United States' Motion for Relief from Stay, due to Mr. Williams' financial inability to amortize the United States' secured claim or to provide adequate protection.

---

[10] As the United States explains in its Rule 9019 Motion, although NFS was the named garnishee, "NFS is a clearing broker-dealer and acts as agent of its affiliate Fidelity Management Trust Company ("FMTC"), and FMTC is the custodian of the IRA." For simplification, this court uses the term "NFS" to refer to all of these related entities.

After approving the settlement, this court denied the Stay Violation Motion and the Motion for Relief from Stay as moot. The United States intended to docket its proposed order approving the settlement agreement in the District Court, and then in this court.

On December 19, 2014, the District Court entered an order implementing the settlement.[11] By the order, the District Court rescinded its Turnover Order and ordered the Clerk of Court to return the funds to the IRA. For reasons unknown to this court, the proposed order implementing the settlement was never actually docketed in this court, either after the District Court order (as contemplated by the parties), or at any time before.[12]

In November 2014, Mr. Williams filed an amended plan that paid the United States $100 per month (as agreed in the settlement) as a claim under § 1322(b)(5). He then filed another amended plan that removed the $100 per month payment but proposed to pay it outside the plan. This court finally confirmed Mr. Williams' plan in March 2015, two years after the Chapter 13 case was first filed.

In the meantime, the creditor holding a deed of trust on Mr. Williams' home filed a motion for relief from stay alleging nonpayment of the mortgage, and Mr. Williams objected. At the hearing on the motion for relief in December 2015, the court granted the motion but stayed execution of the order for 30 days to allow Mr. Williams time to seek a loan modification.

Mr. Williams completed his plan payments and received his Chapter 13 discharge on May 11, 2016. On May 13, 2016, the court closed the case.

---

[11]    The District Court amended its order on January 15, 2015, changing only the amount of funds subject to turnover.
[12]    The court granted the Rule 9019 Motion on the record at the hearing. Thus, although it would have been preferable to have had a separate written order approving the settlement, the legal effect is the same: this court approved the Rule 9019 motion. *See, e.g., In re Nail*, 195 B.R. 922, 931–32 (Bankr. N.D. Ala. 1996) (oral order is effective when made). *Compare* Rule 7058(c)(2)(B) (oral order in adversary proceeding becomes final after 150 days).

*The Current Chapter 13 Case*

Mr. Williams filed his second Chapter 13 case on the same day his previous case closed, without turning over the IRA.[13] Shortly thereafter, the United States filed the instant Motion for Declaratory Judgments, with Suggestions in Support (the "DJ Motion"). As in the prior case, the United States argued that collection of the restitution judgment is excepted from the automatic stay under § 362(b)(1), or, alternatively, that the MVRA supersedes the automatic stay. The United States also sought a broader declaration that its restitution enforcement is not subject to the automatic stay.

In the meantime, Mr. Williams filed a Chapter 13 plan that did not provide for treatment of the United States' secured claim or surrender of the IRA, and proposed only that Mr. Williams pay $100 per month to his creditors. Mr. Williams also filed a request for an extension of time to file a response to the United States' DJ Motion, arguing that he needed time to consult an attorney. The court set the matter for a status hearing, in part to also determine whether the DJ Motion needed to be filed as an adversary proceeding pursuant to Rule 7001(9). Before the hearing, the United States also filed an objection to confirmation, alleging bad faith in Mr. Williams' failure to honor the settlement agreement and to treat the United States' secured claim ("Objection to Confirmation").

At the status hearing in August 2016, the United States confirmed that it was merely seeking a determination that the stay was not in effect, such that no adversary complaint was

---

[13]     Due to Mr. Williams' use of this court's drop box as a pro se filer, it is impossible to know whether he filed the second case just minutes after the first case closed or actually before the first case closed.

necessary.[14] This court expressed its opinion that the DJ Motion presented pure legal issues, but the Objection to Confirmation presented mixed issues of fact and law, due to the bad faith argument. To clarify Mr. Williams' position, this court asked Mr. Williams whether he intended to allow the United States to liquidate the IRA according to the settlement terms. Mr. Williams said he did not. The parties agreed to set the motions (the Objection to Confirmation and the DJ Motion) to an evidentiary hearing. This court scheduled an evidentiary hearing for September 26, 2016, a date agreed to by both parties. In the interim, Mr. Williams filed an untimely[15] response to the DJ Motion, arguing that this court had already decided the issues against the United States and that the automatic stay was in full effect.

Approximately two weeks before the scheduled evidentiary hearing, Mr. Williams filed a motion to continue, alleging that he was attempting to retain an attorney to vacate the District Court's restitution judgment. The United States notified the courtroom deputy that it did not object to the continuance request. The court granted Mr. Williams' motion, cancelled the evidentiary hearing, and scheduled another status conference for October 25, 2016 to determine when another evidentiary hearing could be set.[16]

Mr. Williams then filed a motion to continue the October 25 status conference, arguing he needed more time to attempt to vacate or modify the restitution judgment in the District

---

[14]     This meant that a motion, as opposed to an adversary proceeding, was sufficient. *Compare* FED. R. BANKR. P. 7001 (requiring an adversary proceeding in certain circumstances) *with* FED. R. BANKR. P. 9014 (providing that as to contested matters not otherwise governed by the Federal Rules of Bankruptcy Procedure, a motion is sufficient).

[15]     At the August 2 hearing, this court set August 12 as the deadline for Mr. Williams to file a response to the United States' DJ Motion. At the August 16 hearing, Mr. Williams had still failed to do so, so Mr. Williams made an uncontested oral motion to extend the deadline through the end of the day. Mr. Williams filed the response the next day, outside the extended deadline, but the United States did not object to the untimely filing.

[16]     The August evidentiary hearing had been scheduled in the Springfield courthouse, even though this is a Carthage Division case. Cases in the Carthage Division are normally heard in a state court courtroom, and the court has only limited use of the courtroom there. Any matters requiring more than a few hours of testimony, such as this case, are generally moved to the federal courthouse in Springfield. But that also means the court must work around the needs of the judges who regularly sit there, making it difficult to schedule an evidentiary hearing, particularly when the court has difficulty contacting the party.

Court. After verifying that Mr. Williams had not yet filed any motions in the District Court, notwithstanding that six weeks had elapsed since he said he was doing so, the court denied the motion. Mr. Williams then filed a second motion to continue the October 25 status conference, alleging he would be out of town for a sales meeting. The United States opposed the motion to continue, but this court granted Mr. Williams' motion, noting that it was disappointed Mr. Williams had not raised the employment-related conflict to begin with and agreeing with the United States that it appeared Mr. Williams was stalling. Nonetheless, finding that a brief continuance of two weeks would not materially prejudice the United States, the court granted the continuance, also warning Mr. Williams that it would not allow further continuances absent extraordinary circumstances. The court continued the status conference for two weeks, or until November 8, 2016.

On November 8, Mr. Williams reported that he had filed a pro se motion to amend the restitution amount in the District Court. He told this court he wanted it to delay ruling on the United States' DJ Motion and Objection to Confirmation while he pursued his offset argument[17] in District Court. The United States again orally opposed the delay. However, to allow Mr. Williams one last chance to see if he could vacate or modify the restitution order, the court set the matter for an evidentiary hearing on February 23, 2017.[18] In the interim, the District Court denied Mr. William's motion to amend the restitution judgment.

---

[17]    In both Chapter 13 cases, Mr. Williams constantly argued that his restitution obligation should be offset by an amount he claims the restitution payee owes to him (due to a salary dispute). He previously scheduled this claim at $750,000, and the claim is currently scheduled at $859,744. Leaving aside the merits of this claim, this court has no jurisdiction over it, and must accept the District Court's determination of restitution, especially because the District Court considered and ultimately denied the offset argument. This court has (on many occasions) stated that it lacks jurisdiction to change the restitution amount, and merely reiterates here that the matter is settled and outside this court's jurisdiction.

[18]    The first available date with sufficient time for an evidentiary hearing in the Carthage Division.

Before the February 2017 hearing, the United States filed a new motion asking this court to decide its DJ Motion without holding an evidentiary hearing, arguing the facts were not in dispute and that it was entitled to judgment as a matter of law. Two days after Mr. Williams' deadline for responding to the new motion, he asked for an extension of time to respond, alleging he had suffered a stroke. Mr. Williams filed an objection to the new motion one day after the extended deadline.

The court then set a phone hearing on the United States' motion for December 27, 2016. Construing the United States' motion as a motion for summary judgment,[19] the court denied the motion, noting that the United States failed to cite to specific parts of the record as required by FED. R. CIV. P. 56(c)(1) and W.D. MO L.B.R. 9013-1.H and noting from Mr. Williams' original response that there were disputed issues of fact. This court thus denied the motion and confirmed the February 23, 2017 hearing date.

Shortly before the February hearing date, Mr. Williams filed a motion to continue the trial, reporting that he had suffered a second stroke in January 2017 and was physically incapable of participating in a hearing. The United States did not object to the continuance. The court rescheduled the hearing to May 25, 2017. On April 20, however, Mr. Williams filed a motion to continue the May 25 hearing date, stating he needed to travel to Tennessee to attend a grandson's graduation. The motion did not specify whether Mr. Williams consulted with counsel for the United States, as required by W.D. MO L.B.R. 9060-1.C. The Motion did not address how Mr. Williams was physically capable of traveling out-of-state but not of participating in a hearing. The United States opposed the continuance request, citing a need to resolve the issues that had remained unresolved since the infancy of the first bankruptcy case.

---

[19]    FED. R. CIV. P. 56 applies in contested matters. *See* FED. R. BANKR. P. 9014(c). FED. R. CIV. P. 12(c) (governing motions for judgment on the pleadings) does not. *See* FED. R. BANKR. P. 9014(c).

At the hearing on Mr. Williams' motion for continuance, the court noted it would likely deny Mr. Williams' request, given the length of time the matter had pended and the number of previous extension requests. Mr. Williams agreed that if the court excused him from attending the evidentiary hearing, the court could decide the motions on the papers and briefs submitted, and that he would waive his right to present evidence. The United States also agreed that the matters could be submitted on the papers. The court thus took the matters under advisement.[20]

Since having taken the matter under advisement, Mr. Williams filed a motion requesting that the court delay any decision on the United States' DJ Motion and Objection to Confirmation until after May 25, the date set for the evidentiary hearing before it was cancelled based on the parties' agreement to submit the matter without evidence. The United States and the Chapter 13 Trustee objected to Mr. Williams' motion. The court denied the motion, and is ready to rule.

### *The Parties' Arguments*

#### *The Objection to Confirmation*

In its objection to confirmation, the United States identifies many problems with Mr. Williams' Chapter 13 plan.[21] The United States argues that the plan:

- fails to provide for payments on its secured claim
- fails to pay its claim in full
- fails to provide for lien retention
- lacks feasibility, and
- was filed in bad faith.[22]

---

[20]     Technically, four matters were set for trial: The United States' DJ Motion; the United States' Objection to Confirmation; the Trustee's Amended Motion to Deny Confirmation; and BNY Mellon's Objection to Confirmation. The parties understood, however, that neither BNY Mellon nor the Chapter 13 Trustee intended to present evidence. Thus, this court only took under advisement the first two matters: The United States' DJ Motion and the United States' Objection to Confirmation.

[21]     Mr. Williams has only filed one Chapter 13 plan in this case. *See* docket number 25.

[22]     The United States did not explicitly mention bad faith in its Objection to Confirmation. This court, however, construes the United States as making a bad faith argument. In its First Objection to Confirmation (in the first case), the United States did allege that Mr. Williams' case was a "bad faith filing . . . calculated to delay restitution payment." In the DJ Motion at issue, the United States alleges that the Chapter 13 case is a "bad faith filing." Further, in his response to the Objection to Confirmation, Mr. Williams alleges that he filed his case in good

In response, Mr. Williams argues that he filed this Chapter 13 case in good faith, to save his home from foreclosure. Mr. Williams again attacks the validity of the restitution judgment and renews the argument that his son has a lien in the IRA that is superior to the United States' interest. The United States replies that it is improper for Mr. Williams to collaterally attack the validity of the final orders regarding its restitution judgment and the priority of its lien.

### The DJ Motion

In its DJ motion, the United States in essence presents three alternative justifications for liquidating the IRA. First, the United States argues that this court should enforce the settlement in the first case, and issue a declaratory judgment that the stay does not apply based on that settlement. Second, it argues that the broad "notwithstanding" language found in 18 U.S.C. § 3613(a) (part of the MVRA) nullifies the automatic stay of 11 U.S.C. § 362(a). Lastly, it argues that the stay exception in § 362(b)(1) applies because its efforts to liquidate the IRA constitute the "continuation of a criminal action or proceeding." The United States also seeks a broader declaration that enforcement of the restitution is not subject to the automatic stay.

In his response, Mr. Williams denies certain allegations, admits others, and claims he lacks sufficient knowledge of many different matters. Mr. Williams alleges that he filed the petition in good faith and raises the affirmative defense of estoppel, arguing this court has already ruled the issue. In its reply, the United States argues that it is not estopped because this court never actually ruled the MVRA and § 362(b)(1) issues in the first case.

---

faith, showing he thought good faith was at issue. This court mentioned the United States' bad faith argument in its Objection to Confirmation during at least one hearing in this case, and the United States responded as if it meant to make a bad faith argument. Even if this court misreads the United States' Objection to Confirmation and it is not making a bad faith argument, this court has an independent duty to ensure that all of the requirements for confirmation, including good faith, are present. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 n.14 (2010).

### Discussion[23]

At the threshold, the court notes that although it earlier denied the United States' motion for summary judgment in part based on the existence of disputed facts, those disputed facts arise by reason of Mr. Williams' answer that denied many of the United States' allegations. The pertinent facts are, however, undisputed and are ascertainable from the record of these two cases.[24] Based on the court's disposition, the existence of some minor factual disputes do not prevent the court from being able to rule as a matter of law with respect to the most important issue, that is, whether proposing a plan that reneges on a court-approved settlement entered into in a prior case, without any justification, constitutes bad faith.

### Burden on Objection to Confirmation

A Chapter 13 debtor must file a plan. § 1321. To achieve confirmation, the plan must meet the requirements of § 1325(a).  Any party in interest may object to the plan based on noncompliance with any of § 1325's subsections. § 1324(a); FED. R. BANKR. P. 3015(f). A creditor such as the United States is a party in interest entitled to object to confirmation. *See* W.D. MO. L.B.R. 3083-1.D.

The bankruptcy court has, however, an independent duty to verify a plan's compliance with § 1325 even in the absence of an objection. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 n.14 (2010). In the Eighth Circuit, courts have generally borrowed the civil rule that the movant bears the burden of production on an objection to confirmation. This means that the original burden of production on an objection to confirmation rests with the objecting creditor. *See Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1226 (8th Cir. 1987); *In re Smith*,

---

[23]    This court has jurisdiction over both motions. *See* 28 U.S.C. § 1334; 28 U.S.C. § 157(a), (b)(2)(E), (G), (L), (O). No party has contested jurisdiction to decide any of the matters at issue.
[24]    A court may take judicial notice of all matters in its own docket. *In re Nail*, 195 B.R. 922, 924 n.3 (Bankr. N.D. Ala. 1996) (collecting cases).

328 B.R. 797, 801–02 (Bankr. W.D. Mo. 2005); *In re Booth*, 309 B.R. 568, 571 n.3 (Bankr. W.D. Mo. 2004) (trustee bears the burden of proof on an objection to confirmation). If the creditor produces evidence in support of its objection, then the burden of production shifts to the debtor. *See In re Coleman*, 373 B.R. 907, 912 (Bankr. W.D. Mo. 2007);[25] *In re Gleason*, 267 B.R. 630, 633 (Bankr. N.D. Iowa 2001).

Courts differ, however, on the ultimate burden of persuasion. *Compare In re Smith*, 328 B.R. 797, 802 (Bankr. W.D. Mo. 2005) (suggesting that the better rule is that the debtor has the ultimate burden of proof on a § 1325(a)(3) confirmation issue) *with* 8 COLLIER ON BANKRUPTCY ¶ 1324.03 n.18 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (putting the burden of persuasion on the objecting creditor). In the Eighth Circuit, it is possible that the burden of persuasion falls on the objecting creditor, as the Eighth Circuit in *Zellner* stated that "at minimum" the creditor bore the burden of production. 827 F.2d at 1226.

### Mr. Williams' Proposed Plan Treatment of the United States' Secured Claim is in Bad Faith

"[T]he court shall confirm a plan if . . . the plan has been proposed in good faith and not by any means forbidden by law; [and] the action of the debtor in filing the petition was in good faith." § 1325(a)(3), (7). These two subsections both relate to good faith, but they are distinct confirmation requirements. "Good faith" is undefined in the Bankruptcy Code, but case law generally uses the same standard under both subsections. *See, e.g., In re Dunson*, 550 B.R. 537, 542 (Bankr. D. Kan. 2016); *see also In re Lancaster,* 280 B.R. 468, 474 (Bankr. W.D. Mo. 2002) (noting that the Eighth Circuit has used the same standard for bad faith under § 1307(c) and § 1325(a)(3)). Good faith is determined under a "totality of the circumstances" analysis. *In re*

---

[25]     *Superseded by statute* (on other grounds). *See In re Turner*, no. 14-43032-13, 2014 WL 6674778 (Bankr. W.D. Mo. Nov. 24, 2014).

*LeMaire*, 898 F.2d 1346, 1349 (8th Cir. 1990); *In re Arlen*, 461 B.R. 550, 553 (Bankr. W.D. Mo.

2011). Courts in the Eighth Circuit look at a variety of factors in determining good faith:

1. the type of debt sought to be discharged;
2. whether the debt is nondischargeable in Chapter 7;
3. the debtor's motivation and sincerity in seeking Chapter 13 relief;
4. whether the debtor has stated his debts and expenses accurately;
5. whether the debtor has made any fraudulent misrepresentation to mislead the bankruptcy court;
6. whether the debtor has unfairly manipulated the Bankruptcy Code
7. whether the debtor has used her best efforts to satisfy the obligation; and
8. the egregiousness of debtor's pre-petition conduct.

*LeMaire*, 898 F.2d at 1349 (factors 1–3); *Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227

(8th Cir. 1987) (factors 4–6); *In re White*, 255 B.R. 737, 744 (Bankr. W.D. Mo. 2000) (factors 7–

8).

The weight given each factor varies with the circumstances in each case. *LeMaire*, 898

F.2d at 1353. The factors should be analyzed "in light of the structure and general purpose of

Chapter 13." *Id.* (citation omitted)*; see also Arlen*, 461 B.R. at 553 (key inquiry in determining

good faith is whether a plan "violates the spirit and purpose of Chapter 13").

Here, it is possible that Mr. Williams filed his second Chapter 13 case for reasons

unrelated to his long-running dispute with the United States. For example, it is possible that Mr.

Williams filed the case hoping to obtain more time to finalize a loan modification on his home.

This is the reason Mr. Williams gave for filing this case in his response to the Objection to

Confirmation. Without more evidence, this court must assume that this reason is true, especially

because the United States bears the burden of production in showing bad faith in an objection to

confirmation. Ultimately, based on the record before it, this court must conclude that the United

States failed in its burden to show that the Chapter 13 case was filed in bad faith in violation of §

1325(a)(7).

That does not mean, however, that Mr. Williams' *plan* has been proposed in good faith. The United States' restitution judgment is a nondischargeable debt under both Chapter 7 and Chapter 13. §§ 523(a)(7), 1328(a)(3). The judgment is a lien on all of Mr. Williams' assets. 18 U.S.C. § 3513(c). After lengthy and extensive negotiations, supervised by Judge Federman as mediator, and after having been given several opportunities on the record to back out, Mr. Williams executed a settlement agreement with the United States in essence granting him forbearance from the United States' collection efforts during the length of his plan. This time was meant to allow Mr. Williams to manage the IRA, hopefully increasing its value, such that at the end of the Chapter 13, he would turn over the IRA in satisfaction or partial satisfaction of the restitution judgment, also having had time to plan for the adverse tax consequences that arise from liquidation.

This court and the District Court approved and assisted in the implementation of the settlement terms. Mr. Williams received the benefit of the settlement in obtaining confirmation of a plan that protected him from the United States' collection efforts while he was under the protection of the automatic stay. Mr. Williams was able to complete his plan making very minimal payments, and to obtain a discharge of his other substantial unsecured debts. Without that settlement, Mr. Williams would never have been able to confirm a plan over the United States' objection, since any plan would have been required to pay the United States' secured claim in full over the life of the plan,[26] something Mr. Williams did not have sufficient income to do. For Mr. Williams to now propose a plan that in essence reneges on that deal is the epitome of bad faith, even if Mr. Williams had other reasons to file a Chapter 13.

---

[26]     § 1325(a)(5). There is also an argument that because the District Court ordered turnover of the IRA before the bankruptcy filing, the IRA was not property of the bankruptcy estate. *See* § 541(a).That argument was not raised in the first case.

On the other side of the bargaining table, the United States gave Mr. Williams every opportunity to abandon the settlement. However, when Mr. Williams made clear he wanted to settle, the United States bargained away its right to seek immediate stay relief or at a minimum adequate protection, remedies this court would likely have granted. It would be extraordinarily unfair and prejudicial to the United States for the court to now fail to enforce the settlement agreement it approved.

The determination of bad faith in the confirmation context is a factually intensive inquiry and most courts eschew any per se rules. However, this court is not the first to find bad faith where one party to a settlement reneges to the other party's detriment. *See, e.g., In re Wilson*, 168 B.R. 260 (Bankr. N.D. Fla. 1994) (bad faith found where motivation in filing Chapter 13 case was to evade paying an obligation stemming from a voluntary property settlement); *In re Elmwood Dev. Co.*, 964 F.2d 508 (5th Cir. 1992) (dismissing second case for lack of good faith where debtor triggered a voluntary drop dead order in the first case and then filed the second case to avoid the drop dead order); *In re Roxy Real Estate Co.,* 170 B.R. 571 (Bankr. E.D. Pa. 1993) (same); *Weiszhaar Farms, Inc. v. Livestock State Bank*, 113 B.R. 1017 (D.S.D. 1990) (same); *In re Miller*, 122 B.R. 360 (Bankr. N.D. Iowa 1990) (bad faith found where plan in second case contradicted the negotiated plan in the first case).[27] Moreover, evidence of Mr. Williams' bad faith can also be ascertained from his record in both cases of late and untimely filings, duplicative filings, raising of issues already decided,[28] and attempts to delay.

---

[27]    At least one court has used judicial estoppel to preclude a party from taking a position inconsistent with the position taken in the settlement. *See In re Air Safety Int'l, L.C.*, 336 B.R. 843, 864 (S.D. Fla. 2005) ("Appellant cannot resist the bargain it struck through settlement. Judicial estoppel exists to prevent parties from conducting themselves the way that Appellant has done in the proceedings below. . . . [R]egardless of the Stipulation's enforceability, Appellant is judicially estopped from making the argument.")

[28]    Mr. Williams' estoppel-type argument is misplaced. In the earlier case, this court never ruled upon the merits of the United States' First Objection to Confirmation or Motion for Relief from Stay, as the parties agreed to mediate before this court rendered a ruling.

The law favors settlement and compromise of litigation, and this is equally true in bankruptcy courts as in other courts. *See, e.g., United States v. Pfizer, Inc.*, 560 F.2d 319, 322–23 (8th Cir. 1977); *In re Sassalos,* 160 B.R. 646, 653 (D. Or. 1993). By minimizing litigation, compromises "expedite the administration of a bankruptcy estate." *In re Novak*, 383 B.R. 660, 669 (Bankr. W.D. Mich. 2008) (citation omitted). A settlement agreement is not rendered unenforceable merely because one party changes his mind or wants out for some other reason. *Allen v. Nevin Waters, D.D.S., PC*, No. 4:11CV01255 AGF, 2012 WL 1745550, at *2 (E.D. Mo. May 16, 2012), *aff'd,* 498 F. App'x 669 (8th Cir. 2013) (citation omitted).

Mr. Williams has offered no justification or reason for wanting to renege on his settlement, leaving the court to surmise that he is just stalling for time before the day of reckoning with both the United States and the IRS. Mr. Williams' proposed plan treatment of the United States is thus in direct violation of his voluntary settlement in the first case and contrary to the courts' strong policy of enforcing settlement agreements. Finding no reason to retroactively modify the settlement that Mr. Williams voluntarily entered into, this court must enforce it. This court finds that the United States met its burden to show Mr. Williams' plan was not proposed in good faith, and sustains its objection to confirmation under § 1325(a)(3).

### Mr. Williams' Chapter 13 Plan Violates § 1325(a)(5)

Even assuming Mr. Williams filed his Chapter 13 case and Chapter 13 plan in good faith, his plan violates § 1325(a)(5).

With respect to each allowed secured claim provided for by the plan, a Chapter 13 debtor has three options: (1) obtain acceptance for the plan from the holder of the secured claim (§ 1325(a)(5)(A)); (2) surrender all collateral to the holder (§ 1325(a)(5)(C)); or (3) satisfy § 1325(a)(5)(B), the so-called "cramdown" provision. *See Assoc. Commercial Corp. v. Rash,* 520

U.S. 953, 956–57 (1997). Under the cramdown alternative, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim [must not be less] than the allowed amount of such claim." § 1325(a)(5)(B)(ii). A claim is "allowed" if filed pursuant to § 501 and a party in interest does not object. § 502(a). A claim is secured "to the extent of the value of such creditor's interest in the estate's interest in such property." § 506(a)(1).

Here, the restitution amount represents an "allowed secured claim" subject to § 1325(a)(5): the United States timely filed a claim, Mr. Williams did not object to the claim (in this case or the last), and the United States is fully secured.[29] *See, e.g., In re Stewart,* 172 B.R. 14 (W.D. Va. 1994) (accepting the IRS' designation of secured amount as an allowed secured claim and requiring the debtor to deal with the secured claim under § 1325(a)(5) because the debtor failed to object to the proof of claim). Mr. Williams thus has three options with respect to the United States' claim: acceptance, surrender, or cramdown. The United States has not accepted the plan. Therefore, Mr. Williams must either surrender the collateral or pay the United States the allowed amount of its secured claim ($183,211.49) through his Chapter 13 plan. Cramdown is only an option, however, where payment through the plan is feasible, which leads this court to its next point.

### Mr. Williams' Plan is not Feasible

All evidence from the record points to the inescapable conclusion that payment of the United States' secured claim through the Chapter 13 plan is highly unlikely. Feasibility, like

---

[29]    *See* Proof of Claim 3-1. The United States filed the judgment in the same manner as a federal tax lien, giving it a lien on "all property and rights to property" of Mr. Williams. *See* 18 U.S.C. § 3613(c). Thus, it is secured up to the amount of everything Mr. Williams owned at the filing date. Here, Mr. Williams' schedules show assets far exceeding the value of the United States' lien. Thus, because this is the only evidence of value this court has, and Mr. Williams has not filed a claim objection or otherwise asked for a valuation under section 506, this court must conclude that the United States is fully secured. *See In re Rowell*, 421 B.R. 524, 529 (Bankr. D. Minn. 2009) (tax lien).

good faith, is a distinct confirmation requirement in § 1325(a) – simply put, the debtor must be able to make all plan payments. § 1325(a)(6) ("[T]he court shall confirm a plan if . . . the debtor will be able to make all payments under the plan and to comply with the plan."). Mr. Williams' most recent schedules, filed September 1, 2016, show a budget surplus of only $247.20 per month, which accounts for $100 per month in restitution. It is possible, though highly unlikely, that Mr. Williams could have introduced evidence at trial showing a change of circumstances sufficient to pay the United States' claim in full through the plan. However, because Mr. Williams waived his right to present evidence, this court must accept his Schedules I and J as accurate indicators of his budget and find that the plan lacks feasibility.

Based on the schedules, payment of the United States' claim through the plan is not possible. Under the United States' calculation, payment of its claim through the plan would require payments of $3,053.52 per month to the United States alone. Because cramdown is not an option, even without the previous settlement, Mr. Williams has no choice but to surrender the IRA. The parties likely recognized this when they settled the United States' First Objection to Confirmation by providing for turnover of the IRA. The United States has met its burden to show that Mr. Williams' plan violates both § 1325(a)(5) and § 1325(a)(6), and confirmation is therefore denied. Mr. Williams will be directed to file a plan within 21 days that provides for surrender of the IRA and treatment of the balance of the United States' claim.[30]

---

[30]    The Unites States should promptly amend its claim upon receipt of the proceeds.

### The DJ Motion is Moot With Respect to the IRA; the Balance of the Relief Requested is not Ripe

Given that the effect of filing a plan proposing surrender of the IRA will estop[31] Mr. Williams from contesting any motion by the United States to lift the stay, the court concludes that the United States' motion for declaratory judgment with respect to liquidation of the IRA is moot. Likewise, if Mr. Williams fails to timely file a confirmable plan, the case will be dismissed.[32] The balance of the DJ Motion requesting a determination that the restitution enforcement is not subject to the automatic stay should be denied without prejudice[33] because the matter is not ripe for a declaratory judgment.[34]

---

[31]    *See* § 362(d)(1) (stay lift for cause, including lack of adequate protection); § 362(d)(2) (stay lift when debtor has no equity and property is not necessary for an effective reorganization).

[32]    § 1307(c)(1), (3).

[33]    The court is aware that other courts have recently ruled that the MVRA's broad "notwithstanding" language in 18 U.S.C. § 3613(a) (permitting the United States to enforce restitution orders "notwithstanding any other Federal law") overrides other sections of the Bankruptcy Code, such as 11 U.S.C. § 362(a). *See In re Robinson*, 764 F.3d 554 (6th Cir. 2014); *In re Partida*, 531 B.R. 811 (B.A.P. 9th Cir. 2015). Although the issue here was framed as how to square two federal statutes (11 U.S.C. § 362(a) and 18 U.S.C. § 3613(a), this court notes these cases and the United States in its motion here may have failed to consider the interplay of 28 U.S.C. § 3003 of the Federal Debt Collection Procedure Act ("FDCPA") with the Bankruptcy Code and the MVRA. *See, e.g., Morton v. Mancari,* 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). Specifically, 18 U.S.C. § 3613 authorizes the United States to enforce restitution debt "in accordance with the practices and procedures for the enforcement of a civil judgment under Federal or State law." The United States opted to garnish Mr. Williams' IRA in accordance with the 28 U.S.C. § 3205 of the FDCPA. Section 3003(c) of the FDCPA states that it "shall not be construed to supersede or modify the operation of . . . title 11." Section 3613(e) of the MVRA also states that "[n]o discharge of debts in a proceeding pursuant to any chapter of title 11, United States Code, shall discharge liability to pay a fine pursuant to that section, and a lien filed as prescribed by this section shall not be voided in a bankruptcy proceeding." Simply put, the United States' reading of § 3613(a) of the MVRA – that it supersedes the Bankruptcy Code and specifically the Code's automatic stay provisions – renders § 3613(e) completely superfluous. Congress would have no reason to include a provision explicitly denying avoidance of a restitution lien and discharge of restitution debt if *all* bankruptcy provisions were completely inapplicable to restitution. Rather,  a plausible interpretation preserving the intent of § 3613(e) of the MVRA and § 3003(c) of the FDCPA is that Congress intended certain enforcement procedures be subject to the Bankruptcy Code, but merely carefully and explicitly denied debtors the ability to discharge or avoid a restitution obligation. Nonetheless, in light of the court's ruling, the court need not decide the issue at this time. Nor does the court need decide whether, if the stay applies, the United States' civil collection actions against a debtor whose has completed his criminal sentence are exempt from the automatic stay as the "continuation of a criminal proceeding" under § 362(b)(1) of the Bankruptcy Code.

[34]    A prerequisite to declaratory judgment is a "real and substantial controversy admitting of specific relief through a decree of a conclusive character." *Ringo v. Lombardi*, 677 F.3d 793, 796 (8th Cir. 2012) (citation omitted). The controversy must be one "between parties having adverse legal interests, of sufficient immediacy and

### *Conclusion*

The court is sympathetic with Mr. Williams' plight, particularly after his medical difficulties. But the court and the United States have bent over backwards to accommodate Mr. Williams throughout two bankruptcy cases, notwithstanding his efforts to delay. His day of reckoning is now here. The United States and the victim should not be forced to wait any longer.

A separate order will issue.

DATED: May 15, 2017.

/s/ Cynthia A. Norton<br>
United States Chief Bankruptcy Judge

---

reality," and a court must avoid an opinion "advising what the law would be upon a hypothetical state of facts." *Id.* (citationsomitted).